Your Honors, I'm James Tree. I'm representing Ms. Foote today. When Detective McMullin knocked on Ms. Foote's door, he told her that he had been investigating a ring of drug dealers and that her identity had been stolen and asked if he could come in and help her. As he came into the home, and 100% of the interview that he had with Ms. Foote happened inside of her home with a secret camera recording, Ms. Foote was alarmed. Now, the court has asked us to address the Whelan case and how that brings up the issues of harmless error, so I'd like to do that at this time. Whelan is similar to Foote, but Foote is much more egregious in the fact pattern. In Whelan, the interview, Detective McMullin knocked on the door and said, Would you please come outside to my pickup? Whelan then went out to the pickup, and 45 minutes of the one-hour interview was done outside at the pickup. Ms. Whelan had a cell phone that she thought might have a picture of the person that had stolen her identity, supposedly stolen her identity, and invited Detective McMullin to come into the home. And so they went and entered into the home, and the Whelan court very clearly stated that under those circumstances, under those particular facts, it would not be clearly established to a law enforcement officer that he would have to retreat from that invitation. Well, I maybe perhaps read Whelan a little differently on that point because you're making a distinction of a – first of all, I think I certainly was stunned by the fact that such things go on in a case like this. But then Whelan came down, and you're making a distinction between going out to the car and then eventually coming back 45 minutes later. But in the Whelan decision, the court said the Fourth Amendment claim was limited to McMullin's entry into her home and observation of areas inside her home not visible from the threshold. So it seemed to me that the Whelan court was basically saying we're only looking on what went on inside the house, and that's comparable to our situation here. So I'm not convinced that is a distinguishing feature unless there's some other aspect you can point to. So in Whelan, Whelan limited it to inside the home. In Foote, we're not limiting this to inside the home. But why not? So where's the Fourth Amendment violation? So you're either in or out kind of thing. Right. So we do agree that the intrusion into the home violated the Fourth Amendment. We agree with Whelan that any ruse to get inside the home negates consent. But here's the problem I think all of us are reacting to. Ordinarily, things that can be observed from a public place do not violate the Fourth Amendment. You can stand, you know, a police officer can stand on the street corner here and watch people drive too fast or have a drug transaction or whatever, and there's no Fourth Amendment violation to observe from a public place. There's no search. There's no search. Right. I agree with that. So here's what I would appreciate your looking at. If we were simply to ignore everything that happened inside the home, why wouldn't we still have to uphold what the agency has done? Because at least as I read the ALJ's opinion, the bulk of it at the beginning is all about lack of full credibility based on the absence of medical records to support the claimed level of pain. Going through each thing saying, well, to the left hand there's this report and it's inconsistent with your testimony, a back pain, this is inconsistent. So that's the bulk of the credibility finding. Why can't we just ignore what was in the house and determine that any error was harmless? Well, okay, so that takes us into the medical evidence, Your Honor. And we, as a separate error, we allege that the administrative law judge has improperly evaluated the medical evidence. But if we disagree with you about that, and I know you don't concede it, if we disagree with you about that, then can't we simply bypass this Fourth Amendment issue? No, I don't believe so. No, it's too intertwined because the administrative law judge said that she considered the CDIU investigation in assessing the objective evidence. She said she used the CDIU investigation in assessing the credibility. She said she used the CDIU investigation to determine the opinions that Dr. Pellissere gave, that they were, that's her own doctor. I guess we may read the decision slightly differently. There's a portion of it that says, I've not accorded special weight to the report simply because it came from CDIU. And then there are pages and pages of saying, here's the statement about how hard driving was, and yet none of these doctors said thus and such. The clinical findings don't show an inability to hold a book, as she claimed, and so on and so forth. But they're just looking at the testimony versus the medical records. It seemed to me that's how I read it. And if that's the case, I just thought maybe we could avoid this issue. I mean, the ALJ eventually says that, you know, obviously there is some reliance on the CDIU, but the summary says in order that I'm looking at inconsistencies with the objective medical records and with their daily activities as being the first two items relied on and then the CDIU report. Why isn't that substantial evidence that supports the negative credibility determination? Well, there's several reasons, okay? And they go to the fact that a lot of what the administrative law judge said was based upon the information that was obtained inside the home from Detective McMullen. For example, her differences between what the doctors said that Ms. Foote could do and what the judge thought Ms. Foote could do. The only evidence that she thought she could drive for longer than 15 to 20 minutes came because of how she interpreted what Detective McMullen said. But, of course, we can't re-weigh, and this is what I'm trying to parse out. A minute ago you said it was intertwined. We've got a negative credibility determination. It seems there's a bunch of reasons that the ALJ has cited for that determination. I'm trying to figure out why we can't look at the, and you're familiar with the reports, indicating malingering and whatnot. And, Doctor, is it Toews, T-O-E? Toews. He pronounces his name Toews with a V. Thank you. Toews, Schor, and Anderson. I'm sure you're familiar with those records, of course. I am. And so why can't we look to those and say that's substantial evidence supporting the negative credibility determination and not rely on the CDIU investigation at all? That's my problem. Yeah. The reason is because the harmless error rule as set out by the 9th Circuit and Stout case is that unless the court can confidently conclude that no other reasonable ALJ would reach a different conclusion, the error is not harmless. So is that what you meant when you said it's too intertwined? Do you think we just can't suss this out in this particular case? Yeah. There's going to be a reasonable ALJ that would come up with a different conclusion under the facts of this case if you took out the CDIU investigation. And that's the test. But I think part of what you're saying is we can't do a redo on appeal. In other words, we can't slice and dice unless the ALJ did it actually so that we could excise the information. I think that's kind of what you're saying is that we're not permitted to do that. But even with that, under Whalen and given the timing, as I understand it, that this all is taking place in 2012. I mean, excuse me, 2015. And as of that date, and Whalen isn't issued until 2018, we don't really have a basis for exclusion if we follow Whalen. So it gets you to the same place, doesn't it? You know, to Ms. Foote, it doesn't matter. No, I understand. It doesn't matter if the evidence of the CDIU is excluded or not excluded, other than she, as Detective McMullen said, she's a kind lady. And she does want me to impress upon the Court that she doesn't want this to happen to anybody else. And without exclusion, I'm afraid this will continue to happen. Well, why wouldn't, I think, Whalen. I would hope the government would have a large year after Whalen to realize that it's unconstitutional, at least as indicated by Whalen, to undertake this kind of a ruse investigation. Yeah, I think the government feels that Whalen was improperly decided, and the appeal period hasn't run on that, obviously. But let's just assume that we're final, just for talking purposes. Okay, for this argument. Just for talking purposes. So then, if there's no exclusion, then why not continue the practice? What prevents the practice from continuing into the future? Well, that's true with any qualified immunity determination. It has the two parts. Is there a violation, and was it already established before the events took place? But once a court announces that it's a violation, that's what should prevent it from happening again. Because it will be excluded the next time. But even given the constitutional violation, we don't invoke the exclusionary rule unless we're really trying to punish for misconduct. And so I think the point is that until this rule was announced, until Whalen was announced, we can't really say this particular search in your client's case was conducted in bad faith. So it seems to me I'm really struggling with which is your argument. There's the exclusionary rule, which it seems to me is tough to invoke here. And then there's, to use your word, you said this evidence is too intertwined. And I tend to agree with Judge McEwen, but I want to give you a chance to correct me if I'm wrong. You seem to suggest that there was a way to parse this. I'm sorry, to not parse it. Does that mean we would have to remand? Is that what you're asking for? To send it back for the ALJ to decide if I set aside this evidence? Or what is it you're asking? Okay, so the first thing we're asking is for a remand for an immediate award of benefits. Okay. Second thing that we're asking for is that it be found that this was a violation of our Fourth Amendment rights, the entry into the home. Got that. Second, that any ruse, or third, any ruse to get into the home is vitiates consent. But this particular ruse, the identity theft ruse, is so destructive, and it creates such emotional distress to people, as is confirmed by the Department of Justice in their study that we've put in our brief, where 17 million Americans, their identities have been stolen each year. This was a deliberate attempt. Counsel, if we agree with you on the constitutional violation, then you're asking us to invoke the exclusionary rule because? In a civil case, it's got to be egregious or deliberate. Now, in Lopez, they said it doesn't have to necessarily be clearly established. It has. Well, go ahead. In Lopez-Rodriguez, it says that it has to be a deliberate violation or it has to be clearly established. So in Wayland, they said it wasn't clearly established. But how would you know it was a deliberate violation if it wasn't clearly established? I mean, this was apparently de rigueur for the government to do this. So I don't know how we would know it was not known. Because this wasn't something that was made up on the fly. This is done, and in the Wayland case, it says 70 to 80 percent of the time. Well, that shows that it's intentional, but it doesn't show that it's a deliberate violation. That's the difference. I mean, certainly the conduct is intentional, but how can people know that it violates the law until they've been told that it does? May I ask another question? Because you asked for the video to be made part of the record, which the court has granted that motion now. But we won't have you back, probably. So would you give me a little advance warning of what is it in the video that you think we should focus on that's most helpful to your case? A couple things. One is the writing of the answers. Detective McMullen hands her a normal pen. She says she can't, there's no audio, but she rejects the pen and she picks out her special pen. She talked about, she testified that she had to use a special pen to write, but the administrative law judge rejected her inabilities to write based on the CDIU investigation and the fact that she wrote 71 words. A third of those were three letters or less on this six-page form that were given. And so it shows that. It shows her shock that you could clearly see it on her face at the door, and that was the purpose for the entry was so that she could help Detective McMullen in this drug investigation of this identity theft ring. And it shows that she got up and down. It's consistent with what her doctor said, that she could do activities for 15 to 20 minutes at a time. It's consistent to what she testified to, that she can do activities for 15 to 20 minutes at a time. It's consistent with the fact that she can write for four sentences. It's consistent with what Dr. Schmidt, her treating doctor of 19 years, said. He looked at the video and he said, it doesn't change my opinion that she's permanently disabled. There's 13 medical opinions in the record. One of them is from Social Security's own doctor, and I think this is quite illuminating, is the timing of what happened here was that after the first hearing, the appeals council says, hey, you need to get a consultative physical evaluation for this lady. Because at initial, a single decision-maker denied her. Usually a doctor does. But this court has said that that is no evidence when a single decision-maker, that's a non-medical person, denied her. Interestingly, in the record, it shows that at reconsideration, a non-medical person wrote up the RFC, gave it to Dr. Turner, and with a note that's in the record that said, would you please sign this, I've prepared the RFC, and Dr. Turner just simply assigned it, adopting the single decision-maker. So there's no medical opinion at the initial reconsideration. So it wasn't unusual that the appeals council would say, remand for a physical consultative exam. Counsel, you've exceeded your time by quite a bit, and I know we've used some of it with questions, so you may have a minute of rebuttal when the time comes. Thank you, Your Honor. I appreciate that. Thank you. May it please the court, Jordan Goddard, appearing on behalf of the Commissioner of Social Security. Good morning, Your Honors. This case, at its heart, is about the credibility of Ms. Foote's subjective complaints, and the ALJ's finding that those complaints were not reliable is supported by more than just substantial evidence. The evidence in this case is almost overwhelming. Certainly we have the CDIU report, but... What if we, can we suss that out, or do we have to remand that to figure out if we don't, if we're just left with this kettle of fish? It does seem to me to be tough to know what exactly tipped the scales. You're, well, assuming for the purpose of argument that this court would apply the exclusionary rule, which is something I certainly don't concede. Well, I'm not conceding that. I'm just trying to get you to focus on this other point. Absolutely, Your Honor. Basically how we do harmless error analysis, I think, is what we're asking. Yeah. There are a number of different formulations. The Stout formulation is probably the most difficult for the government to meet, but we do meet it here. Why? That's exactly what I'm asking. Well, let me run through some of the facts. There are just so many inconsistencies, along with a lack of objective evidence. I said I was going to start with the inconsistencies. Actually, let me start with the objective evidence. Dr. Timothy, Ms. Foote's own physiatrist, said that he did an extensive workup, but could find no underlying objective basis for her pain. The nurse who worked with the neurosurgeon, Dr. Ward, reviewed the objective medical evidence and she could not correlate the pain complaints to the objective evidence. Perhaps even more significantly, in January 2012, at the hearing, the AOJ, after the remand, called a medical expert, an orthopedic surgeon, Dr. Hudson. And Dr. Hudson said that the spinal abnormalities that are present in the objective medical evidence, the MRIs, the X-rays, are actually present in about half of the population in the U.S. for people in Ms. Foote's age category. And many of them have no symptoms at all. He very clearly stated that any limitations that are assessed in this case do not stem from objective medical evidence, but believing her subjective, essentially crediting her subjective complaints. So I'm asking really about the method. I have a long list here as well, and you haven't gotten to my list yet, of indications in the record from various care providers that would be consistent with the finding of malingering. And with really the point you're making, which is that the medical evidence doesn't provide objective support for her reports of pain. What do we do with that? Well, I think if we look to, say, the Carmichael case, where we also have a harmless error articulation, the appropriate method in evaluating the harmfulness of an error like this is to basically cover up the evidence that came from that harmful error and ask, is the remaining evidence sufficient to support the ALJ's decision? In other words, is there substantial evidence if we don't consider that problematic evidence? Opposing counsel's argument, at least at one point in his argument, when we let him get in a word edgewise, which was that this was too intertwined with the CDIU evidence. What is your response to that? There are many other inconsistencies that come simply from the medical records and have nothing to do with the CDIU report that are mentioned by the ALJ. For instance, there's the care of horses. Ms. Foote consistently denied that she was doing any sort of work when it came to caring for horses. And while the CDIU report does confirm that that is not true, her own medical records show that. She goes in at one point for back pain because she was... Let me ask you it this way. Forgive me for interrupting, but your point, I think, is maybe a good one. Is there anything that we get from the CDIU report that wasn't already called into question by the medical records? I would say at least the extent of her driving might be illuminated a little bit more by her admissions, although there is evidence, especially if we... There was also evidence from external views, not in the home, about her driving and her getting in and out of the car. Driving to Yakima to go shopping, driving to... Yeah, you anticipated exactly where I was going with that, that we do have the statements from the neighbors saying that she regularly drives and they see her... And the investigator's observations outside the home would still be permissible even after Waylon? Absolutely, Judge Graber. There's no reason to exclude those. The investigator, in fact, saw Ms. Foote get in her car with her teenage son and a friend and take them off to apparently... He didn't follow her that day, but she came back two hours later, which indicates that she... It was not just a quick, short trip of five miles or less. She had consistently represented to the agency was her maximum driving capacity. He says he didn't follow her. We don't know that. She might have gone... Yeah. Sat there for two hours. That's true. Although, again, I'm conceding that when it comes to the driving, that's the one area where, yeah, we have some other evidence. We do have the statements, though, and the observations of the neighbors saying she regularly leaves and drives places. And that would lead us to the next question. Assuming the driving is in a cloudy state, if we'll call it that, would the remainder of the evidence be substantial or does it hinge on this particular activity? It doesn't hinge on that activity at all. We have a very extensive record and a very long ALJ decision that notes, for example, the horses, the issue with the horses, the fact that she seeks medical treatment for back pain after lifting a bale of hay, which is just wildly inconsistent with every claim she's made to the agency. We also have the hiking evidence. She testified multiple times that she used to love to hike but was incapable of doing any kind of hiking or camping anymore. Said that ever since her surgery in 2004, she was completely incapable of it. Yet in 2011, she told a mental health counselor that she had spent a weekend in the mountains and gone for a mile-long hike. And it was difficult, but she enjoyed it, and she was planning to go hiking in Mount Rainier the next weekend. We don't know if she ever... In fairness, that record talks about her pushing through pain. It says she did the activity, but it doesn't say that she did it pain-free, in fairness. I read that record. Absolutely, but the question is not, you know, was she pain-free. Because she had represented that, in fact, after that fact, in June 2015 at the hearing, she flat-out denied that she did any kind of hiking. So it's not a question of, you know, was she able to do it pain-free, but rather the reliability of her testimony when she repeatedly said, I don't do this activity whatsoever. She didn't say, I do it rarely and, you know, with pain, but I push through because I love it so much. Supports the negative credibility finding. Absolutely. You have to look at... You have to compare the complaints she's making with the activity she's doing, which the ALJ did appropriately. And the complaints that she's consistently made from 2007 through 2015 are that she was extraordinarily limited and that she wasn't doing any of these activities, like feeding horses or going hiking. And the record just squarely contradicts that. So even if she, you know, was reporting pain in doing this, which, by the way, I would also point out that she was telling that to her mental health counselor. This wasn't an instance where she was going into her treating physician for physical saying, you know, I need some more medicine because I'm in a whole lot of pain. But we... Just offering it to show that she actually went hiking. Absolutely. Yes, I understand. And then we also have the observations by Dr. Taves that you mentioned before. He goes so far as to raise questions of secondary gain and malingering says that he really suspects that there might be a drug addiction driving this or medication addiction, I should say, to be clear. Notes a number of different inconsistencies during his interview with her. For instance, she claimed to be just in extraordinary pain throughout the whole interview, yet when she got there she took her coat off without any sort of visible difficulty. She put it back on without any sort of visible difficulty. She said that she would scream in pain if she was forced to write anything. No qualifier that if I had some sort of special pen it would be okay, but I'll scream in pain if I have to write anything. And Dr. Taves said she filled out all the standard forms. So the record is actually rife with inconsistencies to the point where we really don't need the CDIU report to have substantial evidence in the record. That's just icing on the cake. But I think it's important to note that you don't have to suss that out. You don't have to try to figure out whether or not this decision is supported by substantial evidence, even when we don't consider that CDIU report, because the exclusionary rule is really not appropriate here in light of Whelan. Whelan makes two very important holdings, both of which affect this case one more so than the other. First of all, under Whelan, under the reasoning of Whelan, it's pretty clear that we have a Fourth Amendment violation here. I know that I briefed it differently, but that was pre-Whelan. But maybe more importantly to the outcome of this case, we also have the qualified immunity analysis. And the Whelan court held that there was not sufficient notice that this kind of conduct was a violation of the Fourth Amendment such that any reasonable officer should have known. And as a result, it would be inappropriate to apply exclusion. The government is now on notice that going forward, any such violations that occur after Whelan may be subject to exclusion. But this all clearly occurred before Whelan, and so the court does not have to exclude this evidence whatsoever. And when we add in the CDIU investigation report, when you add in the fact that she told the investigator that she does all kinds of driving, including driving to Yakima, which is about 60 miles from her home, once or twice a month, simply to save money on cigarettes. I don't know how you reconcile that with her repeated claims to the agency that she was only capable of driving for about five miles total, that even when she did that, she was in bad shape the next day and would have to rest all day. At the most recent hearing, she described it as she could drive for about 20 minutes. She also said that she could only sit in one position for about 15. So I'm not sure how she could drive to Ellensburg regularly to do her shopping, as well as driving down to Yakima on a regular basis to save money on cigarettes, if the claims she was making about the degree of her pain were accurate. So when we add in that CDIU investigation, it just makes clear what the evidence already supported, that the subjective complaints that Ms. Foote was making are just not consistent with the evidence. They're inconsistent with her activities, and there's a distinct lack of objective evidence to support the pain that she claimed, whether you attribute it to her spine or, I mean, it's really just not spinal pain that she was complaining of. She complained of these all over. Hands. A number of doctors essentially resorted to calling it fibromyalgia, even though it is undisputed or uncontested that she does not meet the diagnostic criteria for fibromyalgia. Three different doctors said that. The AOJ made that finding, and it has never been contested. So that illustrates that her doctors have just been at a loss to come up with some sort of reasonable theory as to where all these mysterious pain complaints have come from. Dr. Taves maybe gives us one theory, that of possible medication addiction. But beyond that, we have a lot of doctors who have just kind of said in a conclusory fashion, she says she's in a lot of pain, and based on the amount of pain she's telling me, I don't think she can work. And those complaints, as Dr. Hudson pointed out during his testimony, those opinions really are just a reflection of her subjective complaints and are only as valuable as the reliability of those complaints. And here, with the amount of evidence we have, the number of inconsistencies that are pointed out by the AOJ's decision, it's hard for me to see how the AOJ does not meet the substantial evidence standard, whether or not you consider the powerful evidence from the CDIU investigator. I guess I'll just, before I close, I'll touch on the subject of that video that has been admitted into evidence. I think you're going to find it's rather unremarkable. And the real evidence that is significant in the CDIU report is really her admissions about what she was doing, those activities like driving and going to get cigarettes. It's not so much that the detective was trying to play doctor and giving sort of a covert examination in her home. The video does not have audio because of state laws about audio recording. So you're going to watch a 35-minute video of someone sitting on her couch talking with no audio. That's pretty much what you have to look forward to. So that's really not the basis of the concerns raised by the CDIU investigator and accepted by the AOJ on top of the other concerns that have already been raised. Thank you, counsel. Thank you. You may have a minute if you'd like to use it. Dr. Tabes saw her in 2008 over a decade ago. The state agency psychologist that reviewed Dr. Tabes' report didn't give any credence to any malingering. Dr. Tabes didn't diagnose malingering. He diagnosed rule-out malingering. It was ruled out, as the wind went by, by 13 different opinions from treating physicians. Dr. Smith had treated her for 19 years, Dr. Anderson for 9 years. These are long-term treating physicians. Her X-ray report at ER 785 found she had severe degenerative disc disease at T6, T7. Severe is the most severe. They're rated none, mild, moderate, and severe. That's the most severe form of arthritis. She has eight different levels in her spine that has arthritis. She's had major surgery in her neck. She's had three surgeries on her foot. She's had surgery on her wrist for carpal tunnel syndrome. This lady is not a malingerer. Detective McMullen said that she was a kind person who cooperated, who had no criminal history. And this is a red herring. Her doctors have viewed this video. Her doctors have treated her combined for over 25 years and have determined time and time again that she's disabled, that if she had a job to go to, she would miss work, she needs to lie down during the day. She's not completely bed-bound. She admits that. Her doctors admit that. She could work part-time. She did work part-time. She worked for her church two hours a week cleaning the church with the help of her family. She's a good person. She didn't deserve this treatment.  Thank you, Counsel. Thank you, Your Honor. We appreciate the arguments of both of you in this challenging case, and the case is submitted for decision.
judges: McKeown, Graber, Christen